## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| HOWARD SCHWARTZ, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Case No. 4:16-cv-01714 |
| v. ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| MONSANTO COMPANY, HUGH GRANT, DWIGHT M. BARNS, GREGORY H. BOYCE, DAVID L. CHICOINE, JANICE L. FIELDS, ARTHUR H. HARPER, LAURA K. IPSEN, MARCOS M. LUTZ, C. STEVEN MCMILLAN, JON R. MOELLER, GEORGE H. POSTE, ROBERT J. STEVENS, and PATRICIA D. VERDUIN, ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff Howard Schwartz ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Monsanto Company ("Monsanto" or the "Company") against Monsanto, the Company's Chief Executive Officer and Chairman Hugh Grant, and the other members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Monsanto, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between Monsanto and KWA Investment Co. ("Merger Sub"), an indirect wholly owned subsidiary of Bayer Aktiengesellschaft ("Bayer").

2.      On September 14, 2016, Monsanto announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into Monsanto, with Monsanto continuing as the surviving corporation and as a wholly owned subsidiary of Bayer (the "Proposed Transaction").  Pursuant to the terms of the Merger Agreement, Monsanto shareholders will receive $128.00 in cash for each share of Monsanto common stock that they own (the "Merger Consideration").  The Merger Consideration is insufficient and undervalues the Company.  Indeed, analysts have set price targets for shares of Monsanto common stock at $135.00, and the financial analyses performed by Monsanto's financial advisor indicate the Company is worth as much as $163.00 per share.  Furthermore, as outlined below, the Merger Consideration is the result of a flawed sales process.

3.      On October 19, 2016, in order to convince Monsanto's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the terms and details surrounding discussions regarding alternative strategic proposals the Company received from other interested parties; (ii) financial projections for the Company; and (iii) the valuation analyses performed by the Company's financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley") and Ducera Securities LLC ("Ducera") in support of their fairness opinions.  The special meeting of Monsanto shareholders to vote on the Proposed Transaction is scheduled for December 13, 2016.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

4.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Monsanto and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Monsanto shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

6.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Monsanto maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

8.      Plaintiff is, and at all relevant times has been, a shareholder of Monsanto.

9.      Defendant Monsanto is incorporated in Delaware and maintains its principal executive offices in St. Louis, Missouri.  Monsanto provides agricultural products for farmers via its seeds and genomics business segments.  Monsanto produces a wide range of seeds and develops biotechnology traits that assist farmers in controlling insects and weeds, as well as provides other seed companies with genetic material and biotechnology traits for their seed brands.

10.     Individual Defendant Hugh Grant serves as the Chairman of the Board and the Company's Chief Executive Officer.

11.     Individual Defendant Dwight M. Barns is, and has been at all relevant times, a Monsanto director.

12.     Individual Defendant Gregory H. Boyce is, and has been at all relevant times, a Monsanto director.

13.     Individual Defendant David L. Chicoine is, and has been at all relevant times, a Monsanto director.

14.      Individual Defendant Janice L. Fields is, and has been at all relevant times, a Monsanto director.

15.     Individual Defendant Arthur H. Harper is, and has been at all relevant times, a Monsanto director.

16.     Individual Defendant Laura K. Ipsen is, and has been at all relevant times, a Monsanto director.

17.     Individual Defendant Marcos M. Lutz is, and has been at all relevant times, a Monsanto director.

18.     Individual Defendant C. Steven McMillan is, and has been at all relevant times, a Monsanto director.

19.     Individual Defendant Jon R. Moeller is, and has been at all relevant times, a Monsanto director.

20.     Individual Defendant George H. Poste is, and has been at all relevant times, a Monsanto director.

21.     Individual Defendant Robert J. Stevens is, and has been at all relevant times, a Monsanto director.

22.     Individual Defendant Patricia D. Verduin is, and has been at all relevant times, a Monsanto director.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Monsanto (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of October 14, 2016, there were approximately 437 million shares of Monsanto common stock outstanding, held by thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Monsanto will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

## I. The Merger Consideration is the Result of a Flawed Sales Process and Fails to Adequately Compensate Plaintiff and the Class for Their Monsanto Shares

25. Monsanto, together with its subsidiaries, provides agricultural products for farmers worldwide.  It operates in two segments: Seeds and Genomics, and Agricultural Productivity.  The Seeds and Genomics segment produces row crop seeds, including corn, soybean, cotton, and canola seeds under the DEKALB, Channel, Asgrow, and Deltapine brands; and vegetable seeds, such as tomato, pepper, melon, cucumber, squash, beans, broccoli, onions, lettuce, and others under the Seminis and De Ruiter brands.  It also develops biotechnology traits that assist farmers in controlling insects and weeds in corn, soybean, cotton, and canola crops under the SmartStax, YieldGard, YieldGard VT Triple, VT Triple PRO, and VT Double PRO brands; Intacta RR2 PRO brand; Bollgard and Bollgard II brands; Roundup Ready, Roundup Ready 2 Yield, and Genuity brands; and Roundup Ready 2 Xtend and Bollgard II XtendFlex brands.  This segment also licenses a range of germplasm and trait technologies to large and small seed companies.  The Agricultural Productivity segment manufactures and sells herbicides for agricultural, industrial, ornamental, turf, and residential lawn and garden applications for weed control, as well as for control of preemergent annual grass and small seeded broadleaf weeds in corn and other crops under the Roundup and Harness brands.  The Company markets its products through distributors, independent retailers and dealers, agricultural cooperatives, plant raisers, and agents, as well as

directly to farmers.  Monsanto has a collaborative agreement with Novozymes to discover, develop, and produce microbial solutions.  The Company was formerly known as Monsanto Ag Company and changed its name to Monsanto Company in March 2000.  Monsanto was founded in 2000 and is headquartered in St. Louis, Missouri.

26.     The Merger Consideration Monsanto shareholders stand to receive if the Proposed Transaction is consummated fails to adequately compensate them for their shares.  Indeed, according to Research and Markets "Global Agribusiness Market 2016-2020" report, the global agribusiness market is expected to grow at a compound annual growth rate of 2.6% during the period 2016-2020.  According to the report, increasing demand for livestock and dairy products is a key driver for industry growth.  The consumption of meat and dairy products is growing rapidly due to different factors like high disposable income, increasing urbanization, and changing consumption patterns.  In China, the demand for pork is likely to increase.  In Argentina and Brazil, the demand for beef is expected to grow rapidly in the coming years.  By 2030, the consumption of beef is expected to increase by 68 million tons.  This will lead to the growth of agribusiness companies involved in core production as well as livestock breeding and feed.  Monsanto is expected to directly benefit from this expected growth, but, if the Proposed Transaction is completed, its shareholders will not.  Instead, they will have no ongoing equity participation in Monsanto following the merger, and will therefore be unbale to participate in Monsanto's future earnings and growth.

27.     Further, the $128.00 offer price is below the $135.00 price target analysts have set for the Company, and is significantly below the $163.00 share price indicated by certain valuation analyses performed by Morgan Stanley.  Additionally, in July 2016 an analyst at Edward Jones stated that he did not think Monsanto's Board would accept an offer for less than $140.00 per

share, based upon the multiple that Monsanto was willing to pay for Syngenta, a Swiss agricultural company, last year. The Merger Consideration also represents a measly 5.7% premium compared to the Company's 52-week high closing price during the period ending May 11, 2016, the last trading day prior to the release of press reports regarding a potential offer by Bayer to acquire Monsanto.

28.     The inadequate Merger Consideration is the result of a flawed sales process, during which Monsanto's CEO, Hugh Grant, initiated discussions with Bayer to facilitate a strategic transaction in March 2016, apparently without instruction from or oversight by the Board. Indeed, the Proxy notes that Mr. Grant held multiple meetings with senior executives from Bayer and two other companies between December 2015 and March of 2016, but the Proxy does not reference a single Board meeting until May 13, 2016.

29.     Mr. Grant appears to have been particularly eager to engage in discussions regarding a strategic transaction with Bayer. In March 2016, one month after Bayer announced that Mr. Werner Baumann would succeed Mr. Marijn Dekkers as Bayer's CEO and Chairman, Mr. Grant contacted Mr. Dekkers to schedule a meeting in April to be introduced to Mr. Baumann. On or around April 18, 2016, Mr. Grant flew to Bayer's headquarters in Leverkusen, Germany to meet with Mr. Baumann. However, Mr. Grant was previously advised that he should not expect to discuss business issues during his April 18th meeting with Mr. Baumann, because Mr. Baumann would not become Bayer's Chairman until May 1, 2016. It is unclear if and when the Board was advised of Mr. Grant's April 18th meeting with Mr. Baumann and other representatives of Bayer.

30.     Within days of Mr. Baumann taking over as Bayer's CEO and Chairman on May 1st, Mr. Grant proceeded to immediately hold discussions with Mr. Baumann about setting up an in-person meeting. On May 10, 2016, Mr. Grant, Mr. Baumann, and certain members of their

respective management teams met and toured Monsanto's research facility in Chesterfield, Missouri.  Mr. Baumann delivered to and discussed a letter with Mr. Grant proposing a transaction in which Bayer would acquire all of Monsanto's outstanding common stock for $122.00 per share in cash.

31.     From May 2016 through the signing of the Merger Agreement in mid-September 2016, Mr. Grant, other members of Monsanto's senior management, and the Board focused their efforts primarily on completing an all-cash sale of the Company to Bayer.  While Mr. Grant engaged in what appear to be relatively cursory meetings with three other parties, the Proxy paints a clear picture that he and the Board were focused on a deal with Bayer.

32.     Further, during a Board meeting held on June 9 and/or June 10, both Morgan Stanley and Ducera recommended that the Company engage in discussions with other potential counterparties regarding significant strategic transactions to determine if an actionable alternative to a deal with Bayer that would be in the best interests of the Company's shareholders was achievable.  Despite receiving this recommendation to reach out to other parties from their bankers, the Board and Company management engaged with *just one* new party after these meetings, identified in the Proxy as Company C.

33.     Between June and September of 2016, Mr. Grant and/or other members of Monsanto management received proposals for strategic transactions from parties identified in the Proxy as Company A, Company B, and Company C.  The Proxy provides few details regarding the specific terms of the proposals and/or strategic transactions that were discussed with these parties, and Monsanto's shareholders are therefore unable to assess whether these parties presented management with preferable strategic alternatives to a deal with Bayer that should have been pursued more aggressively.

34.     Monsanto management's preference for a deal with Bayer may have been motivated by the financial windfalls they stand to reap if the Proposed Transaction is consummated.  An article from *Reuters* reports that Mr. Grant could land more than $70 million in connection with the Proposed Transaction, and Brett Begemann, the Company's President and Chief Operating Officer, may walk away with a total of $36.5 million for his shares and in gains on his options, accelerated bonuses and severance.[1]

35.     Unlike Monsanto, which proposed an all-cash transaction, Company A had proposed a transaction in which Monsanto's shareholders would receive cash and stock in a combined agricultural company, and discussions with Company B involved an exchange of assets and securities.

36.     Management and Morgan Stanley noted that the principal executive officer of Company B had expressed a strong interest in pursuing a potential transaction, and that such a transaction "*could provide significant value to the Company's shareowners.*"   Proxy at 34. Nevertheless, Monsanto pushed Company B towards a particular transaction, as set forth in a "term sheet" it sent to Company B on August 5, 2016.  While the terms of the term sheet are not disclosed in the Proxy, on August 14th Company B advised Monsanto that it would not be able to pursue the type of transaction outlined in the August 5th term sheet.  Instead, Company B indicated it was interested in discussing alternative transactions involving Company B transferring agriculture assets and cash to Monsanto in exchange for a substantial equity stake in Monsanto.  While the

---

[1] Pamela Barbaglia, Tom Bergin and Anjuli Davies, *Monsanto boss could net $70 million from a Bayer takeover*, REUTERS (May 27, 2016, 12:10 PM), http://www.reuters.com/article/us-monsanto-m-a-bayer-payout-idUSKCN0YI1W9.

parties discussed "ranges of terms," details regarding the terms that were discussed are not provided in the Proxy. Proxy at 34.

37.     Further, Monsanto only made "limited due diligence information regarding the Company" available to Company B, Proxy at 35, while it provided much more robust diligence information to Bayer. The Proxy does not make any reference to Monsanto providing Company A or Company C with diligence information.

38.     In sum, the Merger Consideration fails to adequately compensate Monsanto's shareholders, and is the resulted of a flawed sales process during which Company management and the Board: failed to conduct a sufficient and robust review of strategic alternatives; largely ignored their advisors' recommendation to reach out to additional counterparties regarding significant strategic transactions to determine if an actionable alternative to a deal with Bayer that was in the best interests of the Company's shareholders was feasible; failed to adequately pursue proposals from other interested parties that "could provide significant value to the Company's shareowners;" and fixated on finalizing a deal with Bayer.

**II.     The Merger Agreement's Deal Protection Provisions Deter Superior Offers**

39.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Monsanto.

40.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Monsanto shareholders. Specifically, section 6.2 of the Merger Agreement states that the Company and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or knowingly facilitate any inquiry or the making of any proposal or offer that

constitutes, or would reasonably be expected to lead to, an Acquisition Proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations relating to any Acquisition Proposal (other than to state that the terms of this provision prohibit such discussions); or (iii) provide any non-public information to any Person in connection with any Acquisition Proposal.

41.     Additionally, Section 6.2 of the Merger Agreement grants Bayer recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) five business days to negotiate with Monsanto, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

42.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Bayer can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Bayer, to the detriment of Monsanto's public shareholders.

43.     Lastly, the Merger Agreement provides that Monsanto must pay Bayer a termination fee of $1.85 billion in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Monsanto shareholders with a superior offer.

44.     Ultimately, these preclusive deal protection provisions restrain Monsanto's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

45.     Given that the preclusive deal protection provisions in the Merger Agreement

impede a superior bidder from emerging, it is imperative that Monsanto's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

### III.   The Materially Incomplete and Misleading Proxy

46.     On October 19, 2016, Monsanto filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

47.     As set forth above, the Proxy notes that Mr. Grant held multiple meetings with senior executives from Bayer and two other companies between December 2015 and March of 2016, but the Proxy does not reference a single Board meeting until May 13, 2016.  Proxy at 27-28.  It is therefore unclear whether Mr. Grant was acting with the Board's knowledge or authority when he engaged in discussions with these parties.  Shareholders would undoubtedly find it material to know whether or not the Company's CEO was engaging in discussions regarding strategic alternatives for the Company without the Board's knowledge or authority, and the failure to specify whether or not any Board meetings occurred during this time period, and, if so, provide a fair summary of the discussions that occurred at such meetings, renders the "Background of the Merger" section of the Proxy refencing this time period materially incomplete and therefore misleading.

48.     Further, the Proxy notes that on June 9 and 10, 2016, in response to a request from the Board, management provided information "regarding the *expected value* to the Company and its shareowners of a range of potential standalone alternatives."  Proxy at 30.  However, the Proxy fails to provide any information regarding and/or quantification of the "expected value" that was discussed.  The omission of such information renders the vague reference to "the expected value to the Company and its shareowners of a range of potential standalone alternatives" materially incomplete and therefore misleading.  Without such information, shareholders are unable to assess the "expected value" they could receive were the Company to pursue standalone alternatives.

49.     The Proxy also fails to provide adequate information regarding the strategic transaction proposals Monsanto received from Company A and Company B.  On June 16, 2016, Company A made a proposal to Monsanto to combine their respective agricultural businesses in a transaction in which Monsanto's shareholders would receive cash and stock of the combined agricultural company.  On June 20, 2016, Monsanto entered into a confidentiality agreement with Company A, and a representative of Morgan Stanley spoke to a representative of Company A regarding potential further exploration of its preliminary proposal.  On July 7 and 13, 2016, representatives of Monsanto's management, Monsanto's legal and tax advisors and Morgan Stanley met with representatives of Company A's management and its financial and legal advisors, *during which they discussed Company A's preliminary proposal, including matters relating to potential synergies, transaction structuring and process, tax considerations and corporate governance matters*.  However, the Proxy fails to provide sufficient details regarding the terms of Company A's proposal or its potential value.  The Proxy makes clear that Defendants and their financial advisors were able to ascribe a value to Company A's proposal, because on July 15, 2016, a representative of Morgan Stanley spoke with a representative of Company A to encourage

Company A to "improve its proposal to *offer greater value* to Monsanto shareowners…"  Proxy at 32, and on August 7th Mr. Grant purportedly advised Company A that its proposal was "*financially inadequate* and raised significant governance concerns…"  Proxy at 33.  The Proxy fails to explain what the "significant governance concerns" were.

50.    Then, on August 11 and 12, 2016, Monsanto management and Morgan Stanley provided the Board with an "estimated trading value of Company A's proposal of approximately $110 – $120 per Monsanto share, *with the possibility for additional value over the long-term*."  Proxy at 34.  The Proxy fails to elaborate on or quantify the "additional value over the long-term" that Company A's proposal could provide to Monsanto shareholders.  Such information is clearly material to the Company's shareholders as they assess whether or not they should forego their equity stake in the Company for Bayer's all-cash offer.  The omission of this information renders the brief and vague descriptions of Company A's proposal in the Proxy materially incomplete and therefore misleading.

51.    The references in the Proxy to Company B's proposals are similarly incomplete and misleading.  On August 5, 2016, in response to Company B's discussions of potential conceptual proposals, representatives of Monsanto sent a term sheet for a potential strategic transaction involving an exchange of assets and securities to representatives of Company B.  Proxy at 33.  However, the Proxy fails to provide any of the terms that were contained in the term sheet. The Proxy makes clear that Monsanto and its financial advisors were able to ascribe a value to Company B's proposals, as during Board meetings on August 11 and 12, 2016, management and Morgan Stanley noted that "the principal executive officer of Company B had expressed a strong interest in pursuing a potential transaction with the Company, *which could provide significant value to the Company's shareowners*."  Proxy at 34.

52.     On August 14, 2016, Michael Frank, Senior Vice President, Chief Commercial Officer of the Company, and a representative of Morgan Stanley met with the principal executive officer of Company B, during which they continued to have preliminary discussions regarding potential strategic transactions.  The principal executive officer of Company B advised Monsanto that Company B would not be able to pursue the type of transaction outlined in the Company's term sheet that the Company had provided on August 5, 2016, but was interested in discussing alternative transactions involving Company B transferring agriculture assets and cash to Monsanto in exchange for a substantial equity stake in Monsanto.  While the parties discussed potential ranges of terms and other provisions that could be part of such transactions, the Proxy fails to provide any information regarding the "ranges of terms and other provisions" that were discussed. Proxy at 34.

53.     On August 15, 2016, Mr. Grant met with the principal executive officer of Company B, at which time they discussed Company B's oral proposal for an exchange of assets and securities and possible transaction structures.  Proxy at 34.  Once again, the Proxy fails to provide any information regarding the terms of Company B's proposal.

54.     On August 26 and 27, 2016, Mr. Grant and a representative of Morgan Stanley met with the principal executive officer of Company B to discuss further a range of potential strategic alternatives that had been reviewed at their prior meeting.  The principal executive officer of Company B authorized Company B's financial advisor to have further discussions with representatives of Morgan Stanley, which continued over the following two weeks.  The proxy fails to provide any information regarding the structure or terms of the strategic alternatives that were discussed.

55.     Additionally, on August 28, 2016, Mr. Grant had a conversation with the principal executive officer of Company C, during which they discussed potential strategic transactions.  While the principal executive officer of Company C expressed interest in potential strategic transactions involving Monsanto, the Proxy fails to provide any details regarding the types or structure of the strategic transactions that were discussed.  Proxy at 35.

56.     In sum, the Proxy continuously makes vague references to the proposals Monsanto received from Company A and Company B, and fails to provide shareholders with sufficient information to assess whether the proposals are more attractive to them than Bayer's offer and warrant pursuing.  The omission of such information renders the vague descriptions of Company A's and Company B's proposals incomplete and misleading.  The Proxy also fails to provide sufficient information regarding the types or structure of transactions that were discussed with Company C.  Without such information, Monsanto shareholders cannot make an informed decision concerning whether they should accept Bayer's offer, or vote against the Proposed Transaction so that the Company can continue its discussions with Company A, Company B and Company C. Indeed, the Proxy notes that as of September 11, 2016, Company B indicated that it was *strongly interested in pursuing a potential strategic transaction with Monsanto*.

57.     The Proxy also fails to provide Monsanto shareholders with sufficient information to assess and understand the valuation analyses performed by Morgan Stanley and Ducera. Defendants have told Monsanto shareholders that such analyses support the financial fairness of the Merger Consideration, and it is therefore imperative that shareholders receive all material information necessary for them to assess these analyses.

58.     With respect to Morgan Stanley's *Comparable Company Analysis*, the Proxy notes that Morgan Stanley calculated various multiples for the three companies it selected for this

analysis.  However, the Proxy fails to disclose the individual multiples or high/low, mean and median multiples Morgan Stanley calculated for each Company, and instead only provides the "ranges of EBITDA and price to earnings multiples" Morgan Stanley *applied* to calculate implied value per share ranges for Monsanto common stock.  Proxy at 49.  The omission of the individual multiples for each company or the high/low, mean and median multiples renders the summary of Morgan Stanley's *Comparable Company Analysis* and the implied value per share ranges listed in that section of the Proxy materially misleading.

59.     Similarly, the Proxy fails to disclose the individual multiples or high/low, mean and median multiples Ducera calculated in connection with its *Public Trading Comparables Valuation Analysis* and *Analysis of Precedent Transactions*.  Proxy at 56-57.  Instead, the Proxy only provides the multiple ranges Ducera *selected and applied* to calculate the implied value per share price ranges for the Company's shares.  The omission of the individual multiples for each company and transaction and/or the high/low, mean and median multiples renders the summary of these analyses and the implied value per share ranges listed in that section of the Proxy materially misleading.

60.     A fair summary of a *Comparable Company Analysis* and *Precedent Transactions Analysis* requires the disclosure of either the individual multiples for each company, or, at the very least, the high/low range, mean and median multiples.  Merely providing the range that a banker *applied* is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

61.     Lastly, the Proxy fails to disclose the projected unlevered free cash flows for Monsanto for the years 2017 through 2025, which both Morgan Stanley and Ducera utilized in

connection with their *Discounted Cash Flow Analysis*.  Proxy at 51, 58.  The unlevered free cash flows were either prepared by Monsanto management, or were derived from projections prepared by Monsanto management or based on guidance from Monsanto management.  The cash flow projections therefore constitute the best estimates of the Company's future stand-alone prospects.

62.    The best estimate of the future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information.  Faced with the question of whether to accept cash now in exchange for forsaking an interest in Monsanto's future cash flows, Monsanto shareholders would obviously find it important to know what management and the Company's financial advisor's best estimates of those future cash flows are.  When shareholders must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance.  This is because the shareholders must measure the relative attractiveness of retaining their shares versus receiving a cash payment, a calculus heavily dependent on the shareholders' assessment of the company's future cash flows.  Under sound corporate finance theory, the value of stock should be premised on the expected future cash flows of the corporation; accordingly, the question that Monsanto shareholders need to assess in determining whether to vote for the Proposed Transaction is clear: is the price being offered now fair compensation for the benefits they will receive as a shareholder from the future expected cash flows of the corporation if the corporation remains as a going concern?  The tradeoff here is that Monsanto shareholders can get $128.00 for sure, but must forsake the value they can obtain if the corporation remains independent and delivers on the expected cash flows.  The omission of the unlevered free cash flow projections renders the sections of the Proxy summarizing Morgan Stanley's and Ducera's *Discounted Cash Flow Analyses*, as well as the section of the

Proxy summarizing the Company's prospective financial information, materially incomplete and therefore misleading.

63.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against Monsanto and the Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

64.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

66.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.   Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the terms and details surrounding discussions regarding alternative strategic proposals the Company received from other interested parties; (ii) financial projections for the Company; and (iii) the valuation analyses performed by the Company's financial advisors, Morgan Stanley

and Ducera.

67.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

68.     The Individual Defendants knew or were reckless in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Morgan Stanley and Ducera reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Morgan Stanley and Ducera as well as their fairness opinions and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company's unlevered free cash flows and the proposals received from interested parties and communications with such parties.  The Individual Defendants knew or were reckless in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review the bankers' analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the

procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

69.    Individual Defendant Hugh Grant, the Company's Chief Executive Officer, was, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Mr. Grant was negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which he was required to do carefully as the Company's CEO.  Indeed, Mr. Grant was intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.  Monsanto is also deemed negligent as a result of Mr. Grant's negligence in preparing and reviewing the Proxy.

70.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

71.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.    The Individual Defendants acted as controlling persons of Monsanto within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Monsanto, and participation in and/or awareness of the Company's

- 23 -

operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

73.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

75.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

76.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

77.     As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

78.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.     Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 3, 2016

**OF COUNSEL:**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
685 Third Avenue, 26th Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331
E-mail: nfaruqi@faruqilaw.com

*Attorneys for Plaintiff*

Respectfully submitted,

By: /s/ Michael J. Flannery

Michael J. Flannery (MO Bar No. 52714)
CUNEO GILBERT & LADUCA, LLP
7733 Forsyth Boulevard, Suite 1675
Clayton, MO 63105
Telephone: (314) 226-1015
Facsimile: (202) 789-1813
mflannery@cuneolaw.com

*Attorneys for Plaintiff*